## GOLDSCHMIDT THERMIT CO. v. ALU-MINO-THERMIC CORPORATION et al.

District Court, D. New Jersey.    July 22, 1926.

No. 163.

1. Patents ⊚⟹328—900,366, claims 5 and 8, for welding of rails and bars by alumino-thermic method, held not anticipated and valid.

Goldschmidt and Lange patent, No. 900,366, relating to joining or welding of rails, girders, bars, and similar articles by means of super-heated molten metal, representing step in art of alumino-thermic welding, *held* not anticipated, and valid as to claims 5 and 8.

2. Patents ⊚⟹33—Invention is not disproved by showing variation in product.

Variation in the product cannot defeat the charge of invention.

3. Patents ⊚⟹62(3)—Evidence of prior discovery in patent infringement suit must be clear and satisfactory.

Evidence of prior discovery must be clear and satisfactory, to defeat patent infringement suit.

4. Patents ⊚⟹328—1,075,709, claims 1, 2, 4–8, for chemical alteration of thermit scale in thermic welding industry, held valid.

Goldschmidt patent, No. 1,075,709, claims 1, 2, and 4–8, for altering the *thermit scale in* thermic welding industry by transforming oxidation, *held* valid, and not anticipated by prior art.

5. Patents ⊚⟹328—1,153,435, for rail head joint combining butt weld and fusion weld, held valid and infringed.

Lange patent, No. 1,153,435, for rail head joint, combining butt weld and fusion weld, used in thermic welding industry *held* valid, not anticipated by prior art, and infringed.

6. Trade-marks and trade-names and unfair competition ⊚⟹68(1)—Gist of charge of "unfair competition" is loss of plaintiff's trade by reason of deception practiced on the public.

Gist of charge of unfair competition is that public was so misled that plaintiff lost its trade, or some part of it, by reason of deception by defendant.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Unfair Competition.]

7. Trade-marks and trade-names and unfair competition ⊚⟹70.(3)—Company producing metal product labeled "Feralite" held not guilty of unfair competition by use of similar crucibles, catalogues, and packing to those employed by rival concern producing product named "Thermit."

Defendant company, producing metal product called "Feralite," by use of similar appearing crucibles, catalogues, and packings to those used by plaintiff in producing patented product called "Thermit," *held* not guilty of unfair competition, in view of dissimilarity of names, which would prevent the possibility of misleading the public.

In Equity. Patent infringement suit by the Goldschmidt Thermit Company against the Alumino-Thermic Corporation and others. Decree for plaintiff, for an injunction, and for an accounting.

For opinion on appeal, see 25 F.(2d) 206.

Livingston Gifford, Newton A. Burgess, and Charles F. Dane, all of New York City, for plaintiff.

Alan D. Kenyon, Edgar F. Baumgartner, and Kenyon & Kenyon, all of New York City, and Oliphant & Mitchell, of Trenton, N. J., for defendants.

BODINE, District Judge. Three United States letters patent, No. 900,366 to Hans Goldschmidt and Felix Lange, No. 1,075,709 to Hans Goldschmidt and No. 1,153,435 to Felix Lange, assigned to Goldschmidt Thermit Company, are sued upon. Questions of unfair competition were raised at the trial. The patents will be separately considered in the order of issue.

The plaintiff company was organized in 1904 by Prof. Hans Goldschmidt, the discoverer of the alumino-thermic art. His miraculous achievements were before the Circuit Court of Appeals for this Circuit in Goldschmidt Thermit Co. v. Primos Chemical Co., 292 F. 362. Goldschmidt discovered how to obtain the alumino-thermic reaction in a smooth and even manner. In a cold crucible, he placed a mixture of powdered aluminum and metallic oxide. This mixture, when lit at one point, gradually reacted, so that the oxygen was transferred from the metal to the aluminum, so that at the end of the operation the crucible contained a pure metal and an aluminum oxide slag. The pure metal was at the bottom and the aluminum slag at the top. The metal is estimated to have a temperature of 5,000° F. This is 2,000° F. above the melting point of steel. The slag has a somewhat lower temperature.

It is the plaintiff's contention that the three patents in suit were three great forward steps in the alumino-thermic art, advancing the art of thermic welding from a place of academic interest to the fore rank of industrial use. Plaintiff enjoyed a complete monopoly until the defendants, Spilsbury and Barnes, former employees, organized the defendant company to carry on alumino-thermic welding. These men had been in the plaintiff's employ six or eight years, and were undoubtedly familiar with every detail of the business. The defendants, in their catalogue and other advertising, give the tribute of their praise to the Goldschmidt discoveries and process.

[1] The real issue, with respect to patent No. 900,366, is that it constitutes no invention. The specifications, so far as pertinent, are as follows (the italics are mine):

"This invention relates particularly to the joining or welding of rails, girders, bars, and similar articles by means of superheated molten metal. * * *

"In welding by this alumino-thermal process, it has been found in practice that the super-heated molten metal is cooled considerably when brought into contact with the rail or other article and the mold, owing to the coolness of such article and mold. In order to prevent this, and at the same time reduce the quantity of superheated molten metal which is necessary to produce the desired result, and in order also to make the process of joining and welding as cheap as possible, the *mold spaces* formed between the mold and metallic article to which the superheated molten metal is to be connected should be as *narrow as possible.* * * *

"We are aware that, in the employment of the alumino-thermal process, the heating of the metal part or parts has heretofore been practiced; but our invention is distinguished therefrom in that *highly heated gas is forced through the mold space,* preferably through a mold space consisting of a series of narrow channels, which are afterwards filled with superheated metal for the purpose of filling out a solid metal part or uniting two metal articles. * * *

"With regard to the quality of the rails after they are subjected to the present process, we have found that the *heating of the mold and such rails or other parts to a red heat before the superheated molten metal is run into the mold prevents the blistering of the steel;* whereas, when this superheated molten steel or iron is run into the mold without any previous heating of such mold, the steel of the rails has often suffered a great deal."

The secondary part of the invention is disclosed as follows:

"According to this part of our invention, not only the mold and rail or other metal article are to be heated before the superheated molten steel or other metal is run into the mold, but the mixture of aluminum and a metallic compound from which iron or steel is to be reduced *also contains pieces of iron* or steel which have been previously heated. When the alumino-thermal reaction takes place, and the iron or steel is reduced from the mixture, the excessive temperature resulting from the reaction is reduced by the presence of these pieces of iron or steel, and the volume of the molten metal resulting from the ignition of the mass is increased. These pieces of iron or steel may be *heated in any suitable manner,* the most obvious source of

heat for such preliminary heating being the *hot gases from the blacksmith's fire.* Usually these pieces, which are pieces of wrought iron or steel, are heated in a shallow vessel to a bright heat and afterward thrown into the superheated molten metal resulting from the reaction of aluminum and ferric oxide or similar compound. * * *

"When the rails or other parts to be joined have reached a bright red heat and the mold is of a corresponding temperature the pipe *r* and the barrier *a'* are removed and the mold assumes the form shown in Fig. 1. * * *

"At the same time that the mold and metal parts are heated, a crucible should be filled with a mixture of granulated aluminum and oxide of iron. In this mixture a quantity of wrought iron or steel (for example, 30 per cent. of the weight of such mixture) may be placed. * * *

"The free spaces of the mold are of such size that the rail or other metal part is almost or entirely surrounded by the molten steel or metal, and such metal part or parts will be heated up by the molten metal to such an extent as to form therewith a weld or joint."

The plaintiff's position with respect to this patent is that specifically it contains the idea of heating the combined work pieces and mold by a forced current of closely confined gas. In practice a torch is used. The defendants' position is, however, that the patent is broadly for preheating the parts in welding—a thing so old and so necessary that no one can tell when it started.

It must be borne in mind, however, that the alumino-thermic art was distinctly new and most unusual. The slag floats at the top of the crucible, the pure metal is at the bottom. If the crucible is poured in the ordinary way, the slag first comes in contact with the parts to be welded. The prior art taught heating in a reverberatory furnace and with coke fires, but only to "dark red heat."

Specifically, the patent teaches the application of heat after the mold and the solid metal are in position; the heat being applied by forcing heated gases through the narrow channels of the mold spaces. The patent further teaches the heating to a bright red heat. Clearly, the art is a very special one. The teachings of the patent have been closely followed since the patent was applied for and with marked commercial success.

From an abundance of necessary caution, the defendants admitted little at the trial,

or upon the argument, of this case. They do not, however, contend that they do not infringe this patent.

Mr. James Otis Handy, defendants' expert, a metallurgist of great learning, who had no practical experience in thermit welding, had observed some welding being done on the streets of Pittsburgh. He stated, and it is obviously true, that preheating of the mold was old in the foundry art.

The Hansen patent, No. 530,641, shows a portable arrangement for heating casting molds by means of heated gases or superheated air. The purpose of heating the mold is to avoid the chilling effect of casting into a cold space. Patent 6,054, to Fisher & Martin, shows a process for welding cast and wrought iron on steel. The steel is heated to a bright red heat before pouring the iron upon it. The molten metal is further forced through the gates and reused. Patent 302,890 shows a preheating in the mold of the metal to which the liquid metal is to be united. Patent 361,198, to Wheeler, shows a preheating by burning gas introduced into the mold.

Mr. Handy's testimony covers 260 pages of direct and as many more of cross-examination. He mentions 41 references in American and foreign patents and publications, as he said, completely anticipating every feature of the patent in suit. He had spent over a year in preparation for the trial. Finally, pinned down to the closest prior art references, he chose the Goldschmidt patent, No. 729,573, and the corresponding British and German patents. His testimony in response to XQ380 and following was:

"The statement contained on page 2 of the patent referred to, column 2, lines 90 to 100, is: 'For instance, after having adjusted the rails a certain quantity of charcoal may be placed around the joint and then heated under a downwardly directed draft, thereby rendering the rail extremities red hot. Thereafter it is only necessary to remove the charcoal and to clean the welding surface by blowing off the ashes, so that the rails are ready to become welded by casting the metal between the welding surfaces.' My understanding of that statement is that the rails in the mold are heated by a down draft through charcoal, which has been ignited in the mold, and that, without removing anything but the charcoal ash, the mold and mold parts thus heated in the mold are ready to receive the molten metal, which is afterwards cast into it to make the joint.

XQ381. How do you understand that Goldschmidt got the charcoal into the mold?

A. I don't know that the illustration of a mold is anything more than diagrammatic, and there must have been some way to get the charcoal into the mold; the pouring gate, and so forth, not being shown, the construction of the mold as to accessibility is not shown either.

"XQ382. There is no place shown in the drawing for introducing the charcoal into the mold, is there? A. No more than the pouring gate is shown, which must have existed.

"XQ383. What do you understand Prof. Goldschmidt meant by saying 'remove the charcoal'? A. Get it out of the mold, if any was left, or get the ashes away, if the ashes were left, before casting the metal into the mold.

"XQ384. How do you understand Prof. Goldschmidt was to get the charcoal out of the mold? A. The same way he got it in.

"XQ385. You can't reach down somewhere through the top of the mold and get it out while the rails are red hot? A. No; I wouldn't say he would do anything foolish, but he says to use a down draft. There may have been some method of reversing that draft, blowing it out. He speaks about using bellows to blow it out with, at least I think he does; he speaks about blowing off ashes. I had in mind bellows, an appliance for blowing. I knew he wouldn't do it with his mouth.

"XQ386. Don't you think that this passage from line 90 to line 100, page 2, is consistent with the idea that Prof. Goldschmidt used the charcoal for heating the rail before the mold was placed in position? A. No; I do not, because he says, after the heating it is only necessary to remove the charcoal and to clean the welding surface, by blowing off the ashes, so that the rails are ready to become welded by casting the metal between the welding surfaces. There is nothing about putting a mold in position. To my mind, the mold was in position, and was being sucked down through by this down draft induced down through the mold.

"XQ387. Did you ever know any one to use the method of preheating which you have said is set forth in this passage? A. Oh, I don't think of any specific instance; but solid fuel is used in various ways in connection with blast to heat up metal, and this is quite plain to my mind as to what happened in this case, what was done.

"XQ388. With the mold of Goldschmidt, patent 729,573, constructed as shown in your sketch, P–84, what would become of the slag? A. The slag need not enter the mold. If it were melted in an open crucible, it could be

poured off beforehand; if it were in the bottom, tapping crucible, the disposition of the slag which followed the metal would be obvious."

Obviously, Goldschmidt's earlier patent did not specifically anticipate the patent in suit. It is the nearest anticipation in the prior art, and it admittedly disclosed no effective method for. preheating the combined work pieces and the mold by a forced current of closely confined gas.

The defendants' position, then, is that the patent discloses no more than mechanical skill in effectively carrying out the disclosures of the earlier patent, and is at all events no more than was disclosed in a patent to Falk. In Falk Mfg. Co. v. Missouri R. Co. (C. C. A.) 91 F. 155, affirmed (C. C. A.) 103 F. 295, the suit was upon claim 1 of Falk patent No. 580,971, as follows:

"1. An improved method of forming rail joints, consisting in cleaning the rail ends to be joined, forming or adjusting a mold upon said rail ends and over the joint, so as to surround the webs and base flanges thereof, heating said mold and rail ends, and pouring molten metal into said mold around and beneath the base flanges of both rails, and uniting said metal directly to the surfaces of said rail ends by fusion."

The court said:

"In our opinion, without entering into any detailed analysis of the evidence bearing on the state of the art, consisting generally of publications, technical works, mechanical operations, individual experiences, common knowledge, and divers patents—all of which have been carefully considered—the efforts of the patentee, as disclosed by this patent, belong to the domain of mechanical skill, and not to the domain of invention. The proof shows, and common knowledge confirms, that the process of casting upon steel or iron is an old one; that the steps in the process set out in the claims of the patent are each and all of them old, and have been for a long time familiar to, and practiced by, foundry men. The cleaning and heating of the rail ends to prepare them for perfect fusion with the cast; the making of the mold, whether of sand or iron; the heating of the mold, and preparing it for the reception of the cast; the pouring into it of the molten metal, and so filling it that all the parts are involved, and made one with the cast; and, finally, allowing this heated, molten mass to stand long enough to solidify before removal of the mold —are each and all of them steps well known to foundry men and artisans in iron, steel, and metals, long before the application for the patent in suit was made."

The plaintiff, however, has by a most careful analysis of that claim and the claims in suit refuted the analogy. The parallel of the brief is as follows:

| Goldschmidt & Lange Claim 5 | Falk Patent 580,971 |
| --- | --- |
| A mold space having narrow channels | No |
| Forcing a current of heated gas through the mold space | No "forcing" because no substantial pressure |
| Running superheated molten metal into said mold space | No superheat |
| And thereby partly fusing said solid metal | Not fused in the substantial sense of alumino-thermic, if at all |
| Said superheated molten metal and the partly fused portion of the solid metal forming when solidified a uniform weld | No uniform weld between cast iron and rolled steel |

| Goldschmidt & Lange Claim 8 | Falk Patent 580,971 |
| --- | --- |
| A mold space having narrow channels | No |
| Igniting a mixture of finely divided aluminum and a reducible compound of a metal | No |
| Together with relatively large pieces of such metal | No |
| Reducing to a superheated molten state the metal of such compound and such large pieces of metal | No |
| Forcing a current of heated gas through the mold space | No "forcing" because no substantial pressure |
| And thereby partly fusing said solid metal | Not fused in the substantial extent of alumino-thermic if at all |
| Said superheated molten metal and the partly fused portion of the solid metal forming when solidified a uniform weld | No uniform weld between cast iron and rolled steel |

Dr. Hans Goldschmidt was a great chemist and metallurgist. He was a prolific writer and lecturer. By this means he introduced his art, yet he never disclosed this process. He was the master of the art. The defendants claim him, since his death, as their consulting engineer. They also pay him the highest tributes in their catalogues, yet they seek to show that his patents were the mere descriptions of what was common knowledge. For advertising purposes they would place him upon the highest pedestal of scientific fame, and for business purposes they would make him a common mountebank, exploiting nothing to the gullible and futile experts of the Patent Office.

The alleged Seaboard Air Line Railroad shop use is not substantiated by records or other certain data. Mr. Sanderson, a most experienced man and a most pleasing wit-

ness, testified on cross-examination as follows: ·

"XQ28. As a matter of fact, the whole matter of detail is vague in your mind at this time, is it not? A. It is too long ago.

"XQ29. And that is also, I believe you said, true of the dates? A. Yes; I can only give the ·sequence and the process of development, which is clear enough."

How little credence is to be placed upon his testimony that he anticipated the patent, when the very uncertain dates of the alleged experiment run so close to the dates for the application for the patent in suit, is obvious. Sanderson's work was undoubtedly done under the instructions of the patent. This only he has forgotten.

The patent 900,366 is valid and infringed.

In order of issue, the next patent to be considered is the Goldschmidt patent, No. 1,-075,709. This is known as the Thermit patent. It made a practical success of the thermit welding industry. A chart, offered in evidence, clearly shows how the industry advanced with leaps and bounds after the discovery of the idea of chemically altering the thermit scale by transforming the oxidation from a nonuniform distribution into a uniform and determinate state of distribution. The specifications, so far as pertinent, are as follows:

"It has been found possible to produce a very pure ferroso-ferric oxide from iron scale or forge scales which are obtained, as is well known, in large quantities as a by-product in the rolling and working of iron and steel; as in rolling rails, making wire, etc. In the present invention, forge scale or iron scale of this character is employed.

"Forge scale or iron scale consists mainly of oxides of iron, but also contains a large amount of impurities, and hitherto it has been employed mostly as an addition to the charge of blast furnaces, an addition which is usually regarded, in the art, as of inferior value. The mechanical impurities of the scale chiefly consist of mill dust, containing silica or sand, argillaceous materials (dirt or clay), oil, etc. Frequently the scale also contains metallic impurities, such as small particles of iron. The composition of scale varies greatly with the source and with the manner of production. It is, however, a low-grade material. In the present invention, such scale is treated to free it of all impurities, and to produce a uniform product, containing a uniform amount of oxygen. A uniform product of this kind, free of mechanical impurities, and containing a uniform amount of oxygen, and in the physical form of iron scale, is found to be particularly suitable for employment as a constituent of the so-called 'thermit' mixtures; that is, mixtures of powdered aluminum or other reducing metals or alloys with oxide of iron, which, when ignited, give by interaction a pure, highly heated, molten iron. In the most advantageous embodiment of the present invention, the crude scale is first heated to drive off oil and water, to oxidize particles of iron present, to make the oxygen content uniform, and to remove various impurities such as sulphur. This heating should be a calcining or roasting operation.  *  *  *

"After this treatment it is advantageous to sift the scale, and, usually, to subject it to a magnetic separation, in order to remove mechanically admixed sand. From scale treated in the described manner it is often possible to obtain 60 to 80 per cent., and frequently even more than 80 per cent., of pure ferroso-ferric or magnetic oxide of nearly 100 per cent. purity and substantially corresponding to the formula $Fe_3O_4$."

The claims in suit are as follows:

"1. In the manufacture of ferroso-ferric oxide, the process which comprises calcining mill scale in an oxidizing atmosphere.

"2. In the manufacture of ferroso-ferric oxide, the process which comprises calcining mill scale .in an oxidizing atmosphere and subjecting the product to a purifying operation to remove impurities."

"4. In the manufacture of ferroso-ferric oxide, the process which comprises calcining mill scale by an oxidizing flame.

"5. The process which comprises calcining mill scale in an oxidizing atmosphere, purifying the calcined product, and admixing the product with a powdered reducing metal.

"6. The process which comprises calcining mill scale in an oxidizing atmosphere, purifying the calcined product, and admixing the product with powdered aluminum.

"7. A material comprising a substantially pure ferroso-ferric oxide having substantially the composition $Fe_3O_4$ and in lamellar form.

"8. A material comprising a mixture of pure ferroso-ferric oxide having the lamellar form of iron scale and a powdered reducing metal."

What the defendants do is shown in the following excerpt from its catalogue:

"We have developed in Feralite, after considerable research, an alumino-thermic mixture which already marks a new era in this field of welding. We were not satisfied

with using the ordinary commercial grade of iron oxide, so developed a process by which the oxygen is controlled in such a manner that it entirely combines with the aluminum, therefore neither aluminum nor oxygen can enter the steel. On this account, Feralite steel, when poured into a properly prepared mold, is free from blow holes and hard spots."

Before the invention, the plaintiff encountered great difficulty with its thermit, because the mass was non-uniform. What actually takes place when the mill scale is treated, in accordance with the teachings of the patent, is stated by Prof. Francis S. Pond, of Stevens Institute, as follows:

"Therefore I believe that, when the mill scale is roasted, the ferrous oxide first enters the reaction and is converted to ferroso-ferric oxide. It may be by oxygen of the air, it might be by the intermediate formation of ferric oxide, which parts with its oxygen and transfers it onto the ferrous oxide, forming ferroso-ferric oxide, and being in turn reduced to ferroso-ferric oxide, or it may be by the air directly.

"Now, it seems to me that this is the idea conveyed by Dr. Goldschmidt in this patent, namely, that he recognized the fact that mill scale was the mixture of ferroso-ferric oxide and ferrous oxide, and that he conceived the idea that by heating this mixture he could convert the ferrous oxide very largely into $Fe_3O_4$, and thereby secure a chemical compound, which would have the uniform composition and uniform content of oxygen, and I do not find in the prior art literature any direct specific disclosure of this particular conception."

Experts called by the defendants do not agree with Professor Pond. Mr. Handy was of the opinion that the chemical compound $Fe_3O_4$ (ferroso-ferric oxide) did not result at all, but that the product was quasi ferroso-ferric oxide. In other words, a mixture of ferroso-ferric oxide, ferric oxide, and ferrous oxide. The analysis would be precisely the same as though it were all ferroso-ferric oxide.

Claims 7 and 8 are product claims. The defendants particularize against these claims, the assertion that no chemist can by analysis show that the product is ferroso-ferric oxide. They say chemists can only determine the total iron, and then the ferrous iron, and calculate the amount of ferric iron by subtraction, and then calculate therefrom the amount of ferrous and ferric oxide, and that any statement that those two oxides are united to make $Fe_3O_4$ is nothing

but an assumption; that since there is no way of proving the chemical compound of either structure, there can be no infringement of any of the claims in suit; since the product claims call for ferroso-ferric oxide, and there is no way to show that such is the defendant's product, and that the process claims are not shown to be infringed, because they also call for the production of a material which cannot be shown to exist.

To arrive at such a conclusion one must reject the testimony of Prof. Pond, obviously a disinterested and able chemist of the highest personal and professional skill, ignore the claims of Prof. Goldschmidt, admittedly the pioneer in the art, and then reject the admission to the contrary contained in the defendant's own catalogue, published before the dispute arose, and before Mr. Handy began his long employment to defeat the patent after its commercial advantage had been broadly demonstrated.

It is perhaps unfortunate that by known chemical analysis the presence of ferroso-ferric oxide alone cannot be clearly shown. The defendants, however, are following the teachings of the patent. The furnace used is an exact counterpart of the furnace of the plaintiff. They admit both the novelty and need of the invention and that it produced a new era. The catalogue says:

"We have developed in Feralite, after considerable research, an alumino-thermic mixture which already marks a new era in this field of welding.

"Feralite, representing as it does the latest development in alumino-thermic welding, is produced by men of many years' experience in this field, who were convinced of the need of such a uniform product.

"Feralite is the latest achievement of our consulting engineer, Prof. Dr. Hans Goldschmidt, who is known throughout the world as the inventor of the alumino-thermic process."

[2] Variation in the product cannot defeat the charge of invention. The patent calls for a product merely substantially pure, a matter not of 99 per cent. or greater purity, but of substantial variation. Whether the product of the defendant be $Fe_3O_4$ or quasi $Fe_3O_4$, a definite chemical compound or a double compound, it has all the physical properties of $Fe_3O_4$, and when substantially pure, 80° or upwards, the new and valuable results are obtained.

There is little doubt that the patent clearly describes both the method and the product. Mr. Justice Clarke said in Minerals

Separation, Ltd., v. Hyde, 242 U. S. 261, 270, 37 S. Ct. 82, 86 (61 L. Ed. 286):

"Equally untenable is the claim that the patent is invalid for the reason that the evidence shows that when different ores are treated preliminary tests must be made to determine the amount of oil and the extent of agitation necessary in order to obtain the best results. Such variation of treatment must be within the scope of the claims, and the certainty which the law requires in patents *is not greater than is reasonable,* having regard to their subject-matter. The composition of ores varies infinitely, each one presenting its special problem, and it is obviously impossible to specify in a patent the precise treatment which would be most successful and economical in each case. The process is one for dealing with a large class of substances and the range of treatment within the terms of the claims, while leaving something to the skill of persons applying the invention, is clearly sufficiently definite to guide those skilled in the art to its successful application, as the evidence abundantly shows. This satisfies the law. Mowry v. Whitney, 14 Wall. 620 [20 L. Ed. 860]; Ives v. Hamilton, 92 U. S. 426 [23 L. Ed. 494]; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 436, 437 [22 S. Ct. 698, 46 L. Ed. 968]."

The patent having had commercial success and clearly disclosing the invention, and having been slavishly followed by the defendants, not only in building their furnaces and equipments, but also in the very catalogues and literature used in their business, there remains but to consider the prior art references and the question of forfeiture by two years of prior public use.

It might be mentioned in passing that the corresponding German patent has, in that country, been held valid even by the court of last resort: By the sixteenth Civil Part of the First Landgericht, May 5, 1922; by the tenth Civil Senate of the Chamber Court, December 22, 1923; by the First Civil Senate of the Reichagericht, January 5, 1925. The first of these decisions describes the invention of the patent in suit and the problem solved thereby as follows:

"Even before the application of the plaintiff's patent, it was known that the mill scale produced by the rolling of iron consisted chiefly of ferroso-ferric oxide. This mill scale, however, depending on its source and method of production, differed in its chemical composition and was therefore not suitable without further processing for alumino-

thermic purposes, as, for instance, in the case of alumino-thermic welding as well as in the production of metals, it is absolutely necessary to know the heat content of the mixture of oxides and aluminum. Above all, it is necessary that the composition, in order to make any computation possible, be uniform. The inventor of the plaintiff's patent was the first to take up the problem of taking the plentiful mill scale, which is available as a waste product, and converting it into such a uniform product as that in the form of pure ferroso-ferric oxide, corresponding to the formula $Fe_3O_4$, so as to make it possible to use its constant quantity as the basis for alumino-thermic mixtures. Therefore, the basic idea in the invention of the plaintiff's patent lies in the solution of the problem to take the considerable quantities which are available of unevenly composed mill scale, which is contaminated by the dirt of workshops, oil, etc., and which before this time was considered as an almost valueless waste product, and make it into a uniformly composed, pure product suitable for use in the technically important purposes of alumino-thermics. · As a means of solving this problem, the inventor prescribes the roasting of the mill scale, in doing which care must be taken that it is ignited or roasted with an oxidizing flame (page 1, lines 50 to 52, of the patent). This igniting process is, therefore, an inherent characteristic of the plaintiff's discovery."

Of the prior art, 29 references are made, consisting of 13 patents and 16 alleged prior publications. This goodly array of literature was wisely limited by the cross-examination to three patents—Edison, United States, No. 700,136; Roloff, German, No. 162,199; and Jones, British, No. 7761. That none of these patents had anything to do with the matter is clearly shown in the testimony of Prof. Pond.

Edison, in making batteries, shows how he gets a pure scale from plates of Norway iron by heating. He never showed the production of ferroso-ferric oxide by roasting mill scale in an oxidizing atmosphere. Edison's product was mixed with graphite.

Roloff had the same interest as Edison, and disclosed nothing like the patent in suit.

Jones pulverized his scale, heated it with sulphuric acid, producing sulphate of iron, and then oxidized this in a furnace running in air above the atmospheric pressure. The product was used to make paint. In one of his disclosures he runs the air in the furnace charged with sulphuric acid. Jones made

paint, and he used pulverized mill scale treated with sulphuric acid. The second claim, as broad as any, is as follows:

"The preparation of sulphate of iron by heating scale and subjecting it to the action of sulphuric acid or to the action of air charged with acid."

The Goldschmidt patent was applied for March 4, 1911. One Lucas testified to the manufacture and sale of the product of the patent prior to March 4, 1909. Evidence was also introduced as to the specimens of old thermit found at Butte, Kansas City, and Columbia University.

Lucas is an officer of the Liquid Steel Welding Company, an alleged infringer, and one of the defendants in a suit for infringement of this patent brought elsewhere. His testimony should be somewhat corroborated. At the age of 16, he had charge of all operations and preparation for mixtures in the welding and manufacture of metals, at the Goldschmidt plant at Essen. He followed precisely the teachings of the patent at the age of 16, and 14 years before the patent was applied for. His testimony, if believed, would relieve him, now a man, and his company, of the charge of infringement, and invalidate the rather conspicuous work of his former employers. After 7 years of carrying on the Goldschmidt business, Lucas came to this country and assisted Goldschmidt in his lectures at Columbia and Stevens Institute. He now sketches a roasting furnace, designed just as the present furnace is built, and said to be in use in plaintiff's plant in 1904. The testimony is not believable. The plaintiff company accomplished new results after the invention. It became certain, then, that thermit had a place in welding; before then, it was not so certain. The scale was made uniform when the teachings of the patent were followed. The discovery made the results of the new product certain, a great advance.

The plaintiff's witnesses, Cohen and Deppeler, have an interest in the outcome of this suit. Their testimony is, however, supported by the probabilities. Some point was made as to evidence of the purchase of hard coal by the plaintiff prior to the application for the patent, indicative it is said that the process shown in the patent had been used.

The quantity of hard coal purchased is relatively small. As every one knows, it is often used in our climate for heating purposes. This circumstance is mentioned rather to indicate the way in which the defendants now strain for every trifling circum-stance to disparage the invention of Goldschmidt.

[3, 4] The evidence of prior discovery must be clear and satisfactory. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 50, 43 S. Ct. 322, 67 L. Ed. 523. The Butte and Kansas City specimens are not the product now produced under the patents in suit. Exposed to the oxidizing influence of air for 15 years, it is quite impossible to know what they were when made. That they are not wet does not mean that oxidizing has not gone on. Oxidized metal may be quite dry.

There is no proof of date of the Columbia University samples, their contents, or that they are in the same condition as when received. It is obvious that there was a valid patent, which was infringed.

[5] The last of the patents in suit, No. 1,153,-435, to Lange, assigned to Goldschmidt Thermit Company, is stated by the plaintiff to be: Broadly, the idea of a rail head joint combining a butt weld and a fusion weld. Specifically, the idea of combining a butt weld with a fusion weld beside it. Still more specifically, the idea of a butt weld flanked on both sides by a fusion weld. The specifications, so far as pertinent, are as follows:

"In order to unite tramway rails, an alumi-no-thermic welding method has been very widely practiced, according to which method the rail ends were placed at a distance of about 15 to 20 millimeters apart and the intervening space was filled with iron produced by the alumino-thermic process. * * *

"The new or improved method of uniting rail ends consists in inserting into the space between the head portions of the rail ends an intermediate piece of the same material as that from which the rails are formed and then performing the casting in the intermediate space in known manner. It has already been proposed to insert an intermediate short length of rail into the space between the ends of two rails, the short length having the same cross-section as the rails themselves, but it was impossible to obtain, according to this method, a real homogeneous union of the heads of the rail with the head of the inserted short length of rail, because the welding of the head was only effected by the slag resulting from the alumino-thermic reaction.

"*The present method differs from the previous method inasmuch as the intermediate piece of metal inserted into the joint only covers part of the section of the rail head,*

*whereas the whole remaining part of the space is filled up with alumino-thermic iron.* * * *

"The inserted piece and the rail ends are then subjected to a preheating, as described, for instance, in the specification of United States patent No. 900,366 of 1908, and then liquid iron resulting from an alumino-thermic or similar reaction is poured into the mold. The iron flows around the intermediate piece of metal and a perfect homogeneous union of the tread or head portion of the rail ends is obtained, and the said iron fills the remainder of the intermediate space between the rail ends. In this way it is possible to introduce into the tread, which is subjected to wear and tear by the rolling stock, a material which has a capacity for resisting such wear and tear or a durability equal to that of the rail itself. * * *

*"The improved method presents still another advantage over the previous method above referred to, for according to the latter it is necessary to subject the rail ends to a pressing together or so-called jumping action by means of a clamping device, in order to obtain a good union. This drawing together of the rail is not necessary according to the present improved method, but is replaced by the contraction of the iron forming a bulge around the rail end of the intermediate casting applied to the web and foot of the rail and to the exterior parts of the tread. It will be apparent from the drawing that there is no filling of cast metal in the actual tread surface which prevents an unbroken wearing face, or of wear and tear resisting metal owing to the presence of the upper edge of the metal piece b in the gap between the two rail ends."*

The claims in suit are as follows:

"1. A method of uniting railway rails, which consists in inserting between the head portions only of the rails an intermediate piece of metal of such width as to extend across that part only of the heads of the rails which are subjected to wear by the car wheels and of a character corresponding to that of the metal from which the rails are formed, and then fusing said intermediate piece of metal together with the rail ends.

"2. A method of uniting railway rails, which consists in inserting between the head portions only of the rails an intermediate piece of metal of such width as to extend across that part only of the heads of the rails which are subjected to wear by the car wheels and of a character corresponding to that of the metal from which the rails are

formed, and then filling up the remaining part of the space between the rail ends with liquid iron.

"3. A method of uniting rails, which consist in inserting between the head portions only of the rails an intermediate piece of metal of less width than the head of the rail, and then pouring liquid metal into the space between the rails not occupied by said metal piece, whereby said metal piece is fused in position and the web and foot portions of the rails as well as the outer parts of the head portions of the rails are fused directly together by the liquor metal."

In the prior art, the alumino-thermic metal was so conducted as to avoid contact with the rail head. In the patent in suit, the metal is so conducted as to come in contact with the rail head on both sides, and a butt weld between the head portions of the rail is secured by the insertion of a piece of metal between the rail heads. The patent produces a complete weld of small mass having the tread at the joint of the same metal as between the joints.

The defendants again give, by their catalogue, the tribute of their praise to the inventor, but it is claimed that the whole scheme was disclosed in the prior art, but, if not, that the defendants, who use no insert metal, but cut out the web and base of the rail, do not infringe; further, that the patent was completely anticipated by the European application, made more than 12 months before the application for the patent in suit.

Mr. Handy, from a long list of patents and publications, finds that the Goldschmidt patents, 717,840 and 729,573, are the best of his references. The latter does not show a butt weld, and the former does not show the thermit metal extending up and around the rail head. The witness finally shifted his position, and referred to a publication "Practical Hints" for rail welding, as showing the disclosure of the patent. The "Practical Hints" are reference No. 15 in the Exhibit Book, covering the prior art with respect to this patent, and show shims or dutchmen placed at the base of the rail and well below the rail head; obviously, something quite different.

Besides using the method of this patent, the defendants also cut away with a torch part of the base and web of one of the rails, so as to form a gap underneath the head. This method avoids the precise suggestion of an intermediate piece of metal between the rail heads, because the intermediate piece of metal exists only since one rail head ex-

tends out to the other by reason of the undercutting. The claim, so far as pertinent, is "inserting between the *head portions only* of the rails an intermediate piece of metal." The metal is as much placed there if the rails are undercut as if the metal is inserted without undercutting. The metal is present between the rail heads in both cases. In one instance, it is laid in. In the other, the base and web portion of one of the rails is cut away, so that the same effect may be obtained—substantially the same function is performed in substantially the same way.

Mr. Justice Clifford said, in Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 125 (24 L. Ed. 935):

"Except where form is of the essence of the invention, it has but little weight in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result. * * * Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that, if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape."

The references, cited in defendants' brief, Hoffman & Falk, No. 545,040, and Heidelberg, No. 620,071, were cited by the Patent Office, and the claims were limited so as to meet the disclosures of these patents. Defendants' expert did not regard them as the best references in the prior art, so no further discussion will be made with respect to them.

The German patent to Goldschmidt, 273,-104, upon which the suggestion of invalidity, because of a prior foreign application, is predicated, does relate to an insert between the rail heads; but the alumino-thermic metal is not carried up on both sides of the rail head.

Obviously, this patent is valid and infringed, irrespective of whether the undercutting subterfuge is used or not.

[6, 7] This brings us to the charges of unfair competition. The Goldschmidt Thermit Company, the plaintiff herein, licenses the Metal & Thermit Corporation to use its patents in the United States. The business is carried on by that company. Assuming, but not deciding, because unnecessary, that the plaintiff is injured by the acts of the defendant, we will consider whether these acts constitute unfair competition. In general, the acts are as follows: Defendants call their product "Feralite." The plaintiff's licensee's product is called "Thermit." Defendants use similar appearing crucibles, catalogues and packings for its product, although clearly marking everything with its own name, and copyrighted trade-name and trade-marks. Everything the defendants do is a literal copy of the plaintiff's, except that it is done under names which have no similarity.

There was not a word of testimony, and undoubtedly there could not be, that any one was misled by the defendants' acts. Thermit and Feralite are not sold over the counter. The defendants boldly infringed the plaintiff's patents, and took everything but the plaintiff's name and the name of its product. The gist of a charge of unfair competition is that the public is so misled that the plaintiff loses its trade, or some part of it, by reason of the deception. Such was not shown here. The defendants' counterclaim charges of unfair competition seem too feeble, in light of the foregoing memorandum to need further mention.

A decree for an injunction and an accounting may issue.