## ESNAULT–PELTERIE v. CHANCE VOUGHT CORPORATION.

### No. 4842.

District Court, E. D. New York.

Feb. 29, 1932.

Fraser, Myers & Manley, of New York City (Arthur C. Fraser and R. Keith Kane, both of New York City, of counsel), for plaintiff.

Cooper, Kerr & Dunham, of New York City (Drury W. Cooper and Charles H. Keel, both of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This is an action brought by plaintiff to secure relief by injunction and damages for the alleged infringement by the defendant of United States patent No. 1,115,795, issued to the plaintiff, Robert Esnault-Pelterie, of Boulogne-sur-Seine, France, for aeroplane, granted November 3, 1914, on an application filed January 16, 1908, and purporting to be based upon French patent No. 373,763, filed January 19, 1907, delivered March 28, 1907, published May 27, 1909, and patent No. 373,818, filed January 22, 1907, delivered March 28, 1907, published May 28, 1907.

The said United States patent No. 1,115,-795 expired November 3, 1931.

The defendant was served with notice herein on January 6, 1930, and with the bill of complaint herein on March 13, 1930.

The defendant has interposed the defenses of invalidity, noninfringement, and laches.

The instant suit is based upon claims 2 and 5 to 9, both inclusive, of the patent in suit.

The object of the invention is described by the patentee in the specification of the patent in suit as follows:

"The present invention has for its object a monoplan aeroplane with one or several pairs of wings which may be directed or distorted as desired, and provided with rudders or with a tail, the combination of such means having the effect of providing for the longitudinal and transverse stability as well as for the desired direction and ascent and descent of the machine.

"The first embodiment of the invention comprises a single pair of distortable wings and steering rudders for the direction and ascent, the getting out of shape or distorting of the wings resulting in the obtaining of transverse stability and such distorting being obtained by means of subtended stay-wires suitably operated for pulling down simultaneously the fore portion of one wing and the aft portion of the other, or vice versa. The steering rudder is vertical and may be rotated about a vertical axis, while the rudder which steers the aeroplane upward or downward (called for convenience the 'ascensional' rudder) and which is horizontal and is integral with the vertical rudder, may be rotated about a transverse horizontal axis in such a way as to secure the longitudinal stability of the machine and allow of the ascent and descent to be effected.

"A second embodiment of the invention comprises a pair of distortable wings arranged in the same manner as in the previously described construction, and a single horizontal rudder or tail capable of pivoting about a horizontal longitudinal axis, and also about a transverse horizontal axis. This last rudder or tail has the functions of the vertical and horizontal rudders previously described, and when pivoting about the longitudinal axis controls the direction of the machine, whereas, when pivoting about the transverse horizontal axis, it effects the ascent and descent of the machine or holds it level.

"A third embodiment of the invention comprises two pairs of wings both distortable, but one of such pairs of wings is so mounted as to be capable of pivoting about a horizontal longitudinal axis like the tail or rudder of the previously described modification, with a view of so steering the machine in either direction."

■ Before entering into a general consideration of the prior art, it is necessary to determine whether French patent No. 372,-753, issued to the plaintiff for airplane, with two pairs of movable wings, filed December 19, 1906, delivered February 28, 1907, published April 18, 1907, is to be considered as prior art.

So much of section 4887, United States Revised Statutes, now title 35, § 32, United States Code (35 USCA § 32), as is necessary for consideration herein provides as follows:

"§ 32. *Inventions previously patented abroad.* No person otherwise entitled thereto shall be debarred from receiving a patent for his invention or discovery, nor shall any patent be declared invalid by reason of its having been first patented or caused to be patented by the inventor or his legal representatives or assigns in a foreign country, unless the application for said foreign patent was filed more than twelve months, in cases within the provisions of section 31 of this title, * * * prior to the filing of the application in this country, in which case no patent shall be granted in this country.

"An application for patent for an invention or discovery * * * filed in this country by any person who has previously regularly filed an application for a patent for the same invention, discovery, * * * in a foreign country which, by treaty, convention, or law, affords similar privileges to citizens of the United States shall have the same force and effect as the same application would have if filed in this country on the date on which the application for patent for the same invention, discovery, * * * was first filed in such foreign country, provided the application in this country is filed within twelve months in cases within the provisions of section 31 of this title, * * * from the earliest date on which any such foreign application was filed. But no patent shall be granted on an application for patent for an invention or discovery * * * which had been patented or described in a printed publication in this or any foreign country more than two years before the date of the actual filing of the application in this

country, or which had been in public use or on sale in this country for more than two years prior to such filing."

Section 31, referred to in section 32, supra, provides as follows:

"*Inventions patentable.* Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof, not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than two years prior to his application, and not in public use or on sale in this country for more than two years prior to his application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law, and other due proceedings had, obtain a patent therefor."

The plaintiff in the instant suit prepared an application for a United States patent based upon the last-mentioned French patent No. 372,753, and the two other French patents on which the patent in suit is based, to wit, Nos. 373,763 and 378,818, but it arrived in this country more than one year after the application had been filed for French patent No. 372,753, and therefore the plaintiff was debarred from obtaining a patent in this country for the invention or discovery, if any, of the said French patent No. 372,753, and, in so far as this country is concerned, the disclosure of such patent is dedicated to the public.

Plaintiff contends that, inasmuch as the applications for the two French patents on which the patent in suit is based were filed before the French patent No. 372,753 was delivered, under title 35, § 32, United States Code, supra, the application for the patent in suit shall have the same force and effect as if the application had been filed in this country on the dates on which the applications for the French patents on which the patent in suit is based, and that said French patent No. 372,753 is not prior art.

The effective date of French patents is the date of delivery, not the date of application. The cases cited with reference to the earlier provisions of the section, providing for the expiration of the United States patent at the expiration of the foreign patent, are not in point, nor are the cases cited by the defendant with reference to United States patents issued to the same patentee, where the patent on the junior application

was issued earlier than the patent on the senior application in point.

The question here presented seems never to have been considered by the courts, and no cases in point have been cited.

Strictly speaking the French patent No. 372,753 is not prior art, but section 32, supra, says:

"No person otherwise entitled thereto shall be debarred from receiving a patent for his invention or discovery ⸱ * *, unless the application for said foreign patent was filed more than twelve months * ⸱ * prior to the filing of the application in this country, in which case no patent shall be granted in this country."

Therefore, it is the invention or discovery of the foreign patent on which he has failed to file for which plaintiff cannot secure a patent in this country, and it would be contrary not only to the spirit but to the letter of the law to allow the plaintiff to secure a patent for said invention or discovery, because he has also included that invention or discovery in later foreign patent applications on which the application for the patent in suit was based.

Under the provisions of said section 32, supra, the plaintiff by his failure to file an application for a patent in this country, based upon the French patent No. 372,753, lost the right to any monopoly for the invention or discovery of that patent, and cannot have such a monopoly even though such invention or discovery be described and claimed in the two French patents on which the patent in suit is based, as the invention and discovery of the said last-mentioned patents.

Under the French law the plaintiff had the right to claim improvements on said patent for a year.

So much of article 18 of the Patent Law of France, dated July 5, 1844, as amended, as is necessary for consideration herein, provides as follows:

"None but the patentee or persons entitled through him, acting as above mentioned, can during one year legally obtain a patent for an alteration, improvement, or addition to the invention which forms the subject of the original patent. * * *"

The French patents on which the patent in suit is based are for improvements to French patent No. 372,753, and it is only for the invention and discovery of such patents, over the invention of the said French patent No. 372,753, to which was attributed

two levers, one for directional control, the other for lateral and fore and aft stability and instinctive movements, for which plaintiff could legally secure a patent in this country.

In French patent No. 372,753, as is common practice in aeroplanes since the first flight of the Wrights, there were three controls, longitudinal, lateral, and directional. Control was accomplished by the tandem wings c and f, which are differentially adjustable about the transverse horizontal axes d and e, "for the purpose of maintaining the longitudinal equilibrium of the machine and also permitting its ascent and descent," by the wings f, which are differentially adjustable with respect to each other about the axis e, to maintain the transverse equilibrium, and by an independent rudder 4 mounted above the wings f for directional control. Longitudinal and lateral controls are operated by the lever 22 and linkage mechanism; the lever being mounted on a universal joint so that it can "turn in all directions." A downward movement of the lever 22 will cause the machine to nose down, an upward movement of that lever will cause the machine to nose up, and a movement of said lever to right or left will cause a corresponding rolling movement about the longitudinal axis. By giving lateral movements to the lever 23, it, through the rod or cable 27, will operate the rudder 4 for directional control independently of the other controls.

The outstanding advantage which is found by the plaintiff both in French patent No. 372,753 and the patent in suit seems to be identical; that is, that the whole equilibrium or balance of the machine may be controlled by the pilot with one hand.

The structure of French patent No. 372,753 was operative and could be applied to a modern plane to control it.

Fig. 9 of the patent in suit, which embodies one form of the invention, is substantially identical with Fig. 2 of the French patent No. 372,753 and Fig. 3 of the French patent No. 373,818; the only difference being that the rigid wings of French patent No. 372,753 have become warpable for lateral control, instead of being rotated about a transverse axis, and, in addition thereto, one of the wings has been converted into a bird tail, for rotation about a longitudinal axis, to simulate bird flight.

In French patent No. 373,818 the aeroplane represented upon Fig. 3 is described as similar to the one which has formed the subject-matter of the patent of the appli-

cant, filed on December 19, 1906 (French patent No. 372,753), and it is further stated that the same control mechanism, which includes the horizontal lever, may be employed for controlling the machine.

Both in French patent No. 372,753 and in the patent in suit, plaintiff made the same choice of putting the longitudinal and lateral controls under one lever, and of putting the directional control under another.

The only difference so far as any issues here are concerned is the vertical position of the sticks, instead of the horizontal, of the French patent No. 372,753.

Plaintiff, in an effort to show how the French courts have construed the plaintiff's French patents, Nos. 372,753, 373,763, and 373,818, offered in evidence what purport to be copies of the decrees of the French courts in certain actions brought in those courts against alleged infringers. These were received in evidence over the objection of the defendant, and decision reserved on the motion of the defendant to strike them out, and an opportunity given to the respective parties to submit authorities on the question of whether the papers so offered in evidence were properly authenticated. If properly authenticated, they are admissible. Goldschmidt Thermit Co. v. Alumino-Thermic Corporation (D. C.) 25 F.(2d) 196, 202. But, if admitted in evidence, a question would be presented as to their weight, considering the difference in the law and procedure in patent cases in France and this country.

The papers so offered in evidence are not authenticated under the great seal of France. There is no seal affixed of the court of which the papers purport to be judgments, nor is it shown that such courts had no seals.

There is no certificate of any officer that the records were in his custody, nor of the principal judge of the court, attesting to the official character of such person; on the contrary, the certificate appears to be based entirely upon the certification of one Joseph Ruffin, who says that he has compared these copies with the original decrees, and that the copies to which the certificates are attached are true copies. All there is to show the relation of the said Ruffin to the courts is an ordinary stamp on the papers indicating that he was the sworn translator of the Court of First Instance. This is followed by a series of certifications of signatures.

There is no evidence that the said "sworn translator" is the custodian of the court records, or that he had any authority whatso-

ever in the Court of Appeals of Paris and the Court of Cassation, from which courts the certified copies are supposed to come.

The fair assumption is that a translator is not the custodian of court records, and further it is to be noted, from the title of said Ruffin stamped on the papers, that he was the sworn translator of the Court of First Instance, and thus would not even be an officer of the Court of Appeals of Paris, which from its very title is an appellate court and not a court of first instance, and would almost certainly not be an officer of the Court of Cassation, which is a high court of appeal and not a court of first instance.

The papers so offered in evidence are not properly authenticated. Church v. Hubbart, 2 Cranch, 187, 238, 239, 2 L. Ed. 249; American Surety Co. of New York v. Sandberg (D. C.) 225 F. 150, 154, 156, affirmed (C. C. A.) 244 F. 701; Stein v. Bowman, 13 Pet. 209, 218, 219, 10 L. Ed. 129; Lopez v. Gautier (C. C. A.) 41 F.(2d) 914, 915, 916.

The motion to strike out is granted, with an exception to plaintiff.

We will now consider the prior art in evidence in this case.

Patent No. 821,393, issued to Orville Wright and Wilbur Wright, for flying machine, granted May 22, 1906:

The Wrights proposed to use wing warping or distortion for control about a longitudinal axis, and chose a cradle 18 as "a convenient means" for that purpose, to suit the lying down or prone position, but the Wrights did not limit themselves to that means; on the contrary they say that the wing warping "may be manipulated in any suitable manner," which would include the well-known means of levers. The moving of said control member 18 laterally to right or left causes the machine to roll in the direction of the movement of the control member.

The Wrights show, as a convenient means for operating the horizontal rudder 31, an elongated rotary member 37 for ready grasp by the pilot in any lateral position of the cradle 18, upon which the pilot lies face downward, but do not limit themselves to that construction; on the contrary they say that it may be operated "in any suitable manner."

The rotary member 37 operates a similar member 39, which in turn, through a lever arm 40 and link 41, lowers and lifts the rear edge of the rudder 31 about the axis 32,

and when the member 37 is turned in a clockwise direction, Fig. 3, the rear edge of the rudder is lifted to the dotted position shown, to cause the plane to turn also in a clockwise direction about its transverse axis, and vice versa, thus obtaining pitching responses corresponding to the movements of the control member 37.

The Wrights' great advance over the prior art was the discovery that for securing lateral balance and safety in flight, in the unstable warpable wing type of machine like that shown in the patent in suit, it was essential to warp the wings and also to use the vertical rudder.

For convenience and safety in flight, the Wrights chose to operate the wing warping and the vertical rudder by a single means, namely, the warping member 18, and the horizontal rudder by the rotary member 37, thus reducing to two the instrumentalities operable by the pilot. The patent in suit hooked up the wing warping and elevator under one control, with a separate control for the rudder.

In 1905, the Wrights used an entirely separate means for operating the directional rudder.

French patent No. 356,842, issued to Laroze, for principles employed in the construction of an aeroplane to insure its stability, October 19, 1905, shows the vertical upstanding lever H P for lateral and longitudinal control. This is the "simple device" of that patent "which can alone give to the apparatus a sufficient latitude to enable it to make evolutions with ease." It comprises the vertical upstanding lever or column H P, which by a fore and aft rocking movement controls the pitch, and by rotation of that lever or column about its axis effects the lateral control.

This was the same as the patent in suit, but Laroze further simplified the operation of the aeroplane by mounting on the lever or column H P a wheel W W', which may be rotated entirely independently of the two movements of the lever or column H P, to operate the vertical rudder E for steering.

For control of the plane about the longitudinal and transverse axes, L O, M N, small mobile planes or ailerons, a, b, c, d, e, f, and a', b', c', d', e', f', are attached to the rigid nondistortable wings A, B, C, D, and A', B', C', D', thereby differing from the wing warping of Wright and the patent in suit, but being like the rigid wings and ailerons of the defendant's machine. The auxiliary surfaces at the ends of the wings

are ailerons, performing the functions of defendant's ailerons.

Not only may the vertical column H P be operated fore and aft to control the longitudinal stability, and rotated about its axis to control the transverse equilibrium, but by moving the column or lever H P fore and aft, and at the same time twisting it about its axis, both longitudinal and lateral control may be effected.

The patent shows two embodiments; one being in Figs. 1 to 3, and the other in Fig. 4, which is the control diagram for both modifications.

No point is made in Laroze, or in the patent in suit, of any particular hook-up or directional response for the column H P.

The longitudinal response of the plane in Fig. 4 of the Laroze patent, and in Fig. 7a of the patent in suit, is opposite to the rocking movement of the lever or column H P. If it be desired, however, to rise or dip with the rocking movement of the lever or column H P, all that is needed is to reverse the linkage. No such reversal of linkage is necessary in the modifications of Figs. 1, 2, and 3.

The responses, longitudinal and lateral, in Figs. 1, 2, and 3, are directly opposite to the responses in Fig. 4.

In Laroze and in the patent in suit both responses are shown, and in neither is any emphasis whatever put on any particular hook-up.

Plaintiff's expert says that the Dep control embodies the principles of the joy-stick control. Assuming that contention to be correct, then Laroze embodies the principles of the joy-stick control, as the lever shown in the Laroze patent is simply that of the Dep column or lever, with movements about a vertical axis, substituted for movements about a horizontal axis for lateral control, simplified by mounting upon the column or lever the rudder control.

One hand would undoubtedly be sufficient for steering and elevational control of very small machines, as is the standard stick control, which is employed only on comparatively small machines. But two hands are required in any event to operate the three instrumentalities of control, in even large Laroze machines, and but one hand is required for simultaneously operating the directional and longitudinal control. In the patent in suit, however, two hands are required at all times for controlling the three instrumentalities. The forces required for warping the wings, in the patent in suit,

are of necessity very large as compared with the forces required in operating the Laroze ailerons.

The defendant's machine embodies the rigid wings and the ailerons of Laroze for lateral control.

Article by Goupil, in "La Locomotion Aerienne," 1884 (pp. 100–109):

In plates VI and VII is illustrated a machine with the vertical hand-controlled lever for longitudinal and lateral control, which Goupil describes in considerable detail.

The machine shown has a birdlike or stream-lined body, a pair of widely extending dihedral wings, a vertical rudder d, ailerons a and b, which are described as "regulating surfaces," and a horizontal stabilizing tail.

The two "regulating surfaces" a and b, are placed in front to the right and left of the aeroplane (section 60), and these are operated by a "suspended" universally mounted pendulum member, which may be. "operated automatically or manually" to "correct the pitching or rolling movements."

It oscillates relatively to the machine in every direction for lateral and longitudinal control, lateral oscillations operating the surfaces a and b differentially to produce "strong forces" which "right the machine," and longitudinal oscillations operating the surfaces a and b, in one direction to "lift the nose up" when the machine "tilts downward," and the opposite if the machine "noses upward too much."

While it is true, as contended by the plaintiff, that the pendulum or manual control member is not disclosed in detail in the drawings (plates VI and VII), plaintiff's criticism of lack of disclosure seems to be unfounded, as the description of the pendulum or manual member and its construction and operation is clear and definite, and the co-operating parts of the machine are so clearly illustrated, as well as described, that any one skilled in the art could build the machine from the disclosure. Pendulums and their constructions and mountings were so well known for controls of this character that no description or drawings were necessary.

Examples of universally mounted levers, horizontal, inclined, and vertical, for operating two or more separate but related controls, by movements in different planes, with responses corresponding in direction to the movements of the lever, are found in the patents offered in evidence by the defendant, to wit, patent No. 561,777, issued to

Essberger & Geyer, for electrical apparatus for controlling motion of cranes, etc., granted June 9, 1896; patent No. 617,332, issued to J. L. Glazier, for motor vehicle, granted January 10, 1899; patent No. 704,156, issued to C. F. Weeber, Jr., for steering and braking device, granted July 8, 1902.

Plaintiff contends, and I think correctly, that the Essberger & Geyer patent is in a nonanalogous art, but I do not believe that contention can be sustained as to the last two above mentioned patents, which relate to the control of motor vehicles, the motive power of which, as in the case of aeroplanes, is furnished by combustion engines, and which, as do aeroplanes, in taking off and landing, move on the ground.

The lever in the Goupil disclosure is a vertical lever as claimed in the patent in suit, but differs from those of the patent in suit only in being depending instead of upstanding.

The booklet and evidence as to the invention of Capt. Ferdinand Ferber:

Beginning as early as 1901 or 1902, Capt. Ferber, an officer in the French Army, was a pioneer in the development of aeroplanes. He died years ago. He built many machines in which he chose, like the plaintiff herein, to operate the longitudinal and lateral controls by a single means. A particular reference to some machines will be sufficient. The No. 5 and 6 machines represent the progress he made in his inventions. An early form of the No. 5 had only an elevator for longitudinal control. Later, however, lateral control jibs were provided which were hinged to the rear end uprights of the wing cell, with horizontal rods or levers operatively connected with the elevator and the cables for operating the lateral jibs extending to these levers.

An early No. 6 machine, which was the same machine as that last referred to, equipped with a motor, was flown at Chalais Meudon many times in 1904. It employed two horizontal levers or members for operating the elevator and the lateral control jibs. By a fore and aft movement of these levers, the machine could be caused to ascend or descend; by a lateral movement the lateral control jibs are operated; and, by a simultaneous fore and aft lateral movement, the operator could operate both the lateral jibs and elevator at will. A single horizontal lever was later substituted by him in a No. 5 machine, and was flown successfully 55 to 60 meters many times in gliding flights.

By moving the lever fore and aft the el-evator is operated, and by moving it laterally the lateral jibs are operated. The same lever with the wheel on the end is shown on the enlarged photograph attached to chart I, of which it forms a part. Later in his No. 6 (1905) machine he changed his lateral control devices, which had been mounted on vertical axes, so that his ailerons were mounted on inclined axes to obtain a positive aileron action for rolling the aeroplane. He then gave a greater inclination to the axes of the ailerons and also provided two universally mounted upright levers, instead of the horizontal single or double of the earlier machines. The two levers were interchangeably connected by a link or bar at the bottom, and the two levers were operable either by grasping the lower interconnecting link or by operating either lever. By rocking either or both of the upright levers in a fore and aft plane, the longitudinal control or pitch was effected, and by rocking them laterally the ailerons were operated, effecting lateral control. The machine had the dihedral in the wings for lateral stability, and the longitudinal stabilizer for longitudinal stability.

On May 27, 1905, this machine was flown and was "the first powered aeroplane which was mounted (piloted) in full flight in Europe." The machine was operative.

In No. 6, modified 1905–06, Ferber inclined the axes of the lateral ailerons still further. The ailerons and elevator were operated by two universally mounted uprights or levers, which were lashed at 49 to the inclined struts 48, for pivotal movement in all directions.

There was an interconnecting link at the top in addition to the one at the bottom, and the links were loosely or pivotally connected so as to permit the lateral locking movements of the levers.

Unity of action was insured by the interconnecting links. Fore and aft movement of the lower connecting link operated the elevator, and lateral movement of the link operated the ailerons. The machine was flown at Chalais Meudon in 1906.

There was another Ferber machine, 8—9, but this is not prior art to anything disclosed in the original application of plaintiff for a United States patent, but was offered to show that one-hand control was well known long before plaintiff by amendment, on June 12, 1913, inserted claims 7 and 8 at issue. This machine was destroyed.

French patent, No. 380,073, to Ferber, for device for control of rudders of an aero-

plane, filed July 19, 1907, issued September 28, 1907, is not prior art to anything disclosed in the original application of plaintiff for a United States patent, but was offered to show that one-hand control was well known long before plaintiff by amendment, on June 12, 1913, inserted claims 7 and 8 at issue.

The original claims filed in the application for the patent in suit were directed as follows:

Claim 1 to a special wing distorting mechanism; claim 2 to the three organ control; claim 3 to the ring tail on ball and socket joint; claim 4 to the two-lever rigid transmission control; claim 5 to the bird tail; claim 6 to the bird tail and the two "symmetrically" arranged levers; claim 7 to the tandem wings, distortion and bird tail; and claim 8 to the distortable wing structure.

The original application for the patent in suit, which was entitled "System of Monoplane Aeroplane," did not describe nor claim the alleged invention now being asserted with reference to the vertical disposition of the levers, the so-called joy-stick, or of any particular directional response, but described and claimed a wholly different invention with respect to the distortable monoplane structure, the distorting mechanism, and the integral steerable tail unit.

The only claims in the original application which were not specific to the plaintiff's structure were claims 2 and 4, which claims covered the No. 372,753 French patent structure and were withdrawn, as was sheet 1 of the drawings.

The original specifications were objected to by the Examiner in the office action of March 10, 1908, as being confused and unintelligible, and the applicant was required to furnish a specification clearly setting forth the device and the operation thereof in grammatical and idiomatic English.

The original drawings were objected to by the Examiner as being diagrammatic, and new drawings were required which should set forth the mechanism in detail, showing its operative parts.

That none of the original claims were directed to what is now asserted to be the invention is confirmatory of the fact that the now alleged invention formed no part of the original specifications.

In response to the action of the Patent Office, a new specification was substituted on February 1, 1909. Neither in that specification, the original specification, nor the specification of the patent as issued, is anything said with reference to any directional response or any virtue or novelty in the alleged invention now being asserted.

In 1909, the joy-stick control made its appearance in this country, and planes equipped with the joy-stick control were manufactured as well as flown in this country as early as 1910-11.

Figs. 1a, 3a, 7a, 8a, and 9a of the patent in suit were added by an amendment dated February 1, 1909; Figs. 16, 17, 18, and 19 of said patent were added by an amendment dated March 1, 1910; and Figs. 6 and 10 of said patent were substituted, by amendment dated May 23, 1912, for the original Figs. 11 and 15, which the Patent Office repeatedly objected were mere diagrams, insufficient and inadequate to show the relations of the parts.

Claim 2 of the patent in suit was included in the amendment of February 1, 1909. Claims 5 to 9, both inclusive, of the patent in suit, were inserted in June, 1913-14.

The only oath ever made by the plaintiff was the one filed with his original application.

The claims of patent No. 1,115,795, on which this suit is based, are claims 2 and 5 to 9, both inclusive, which read as follows:

"2. An aeroplane having distortable wings for maintaining transverse stability, a rudder for maintaining longitudinal stability, a lever controlling said wings and said rudder, a steering rudder, and a separate lever controlling said steering rudder."

"5. In an aeroplane, the combination of means for producing lateral stability, means for producing longitudinal stability, and a single vertical lever movable in every direction for operating both said means for producing lateral stability and said means for producing longitudinal stability.

"6. In an aeroplane, the combination of means for producing lateral stability, means for producing longitudinal stability, means for steering in a horizontal plane, a single vertical lever movable in every direction for operating both said means for producing lateral stability and said means for producing longitudinal stability, and separate means for operating said steering means.

"7. In an aeroplane, the combination of means for producing lateral stability, means for producing longitudinal stability, and a single vertical lever movable in every direction for operating both said means for producing lateral stability and said means for

producing longitudinal stability, said single lever being operable by reflex movements of the body of an aviator to restore said aeroplane to an even keel when it departs therefrom in either a lateral or longitudinal direction.

"8. In an aeroplane, the combination of means for producing lateral stability, means for producing longitudinal stability, and a single vertical lever movable in every direction operating upon both said means for producing lateral stability and said means for producing longitudinal stability, said lever, upon forward movement thereof, operating said means for producing longitudinal stability to direct the aeroplane downwardly, said lever, upon rearward movement thereof, operating said means for producing longitudinal stability to elevate the aeroplane, said lever, upon movement thereof to the right and left, operating said means for producing lateral stability to raise the aeroplane on the left and right respectively.

"9. In an aeroplane, the combination of means for producing lateral stability, means for producing longitudinal stability and a single vertical lever for operating both said means for producing lateral stability and said means for producing longitudinal stability, said lever being mounted upon an universal joint and being oscillatable in every direction."

The patent in suit shows a special form of monoplane, having distortable wings for lateral control, and a special integral tail unit in two forms for control about, the longitudinal and vertical axes; one form is the so-called "bird tail," and the other the so-called "ring tail," and for warping the wings and steering the tail two symmetrically arranged levers are provided.

The original claims filed with the application were definitely and specifically directed to the plaintiff's specific monoplane wing warping and tail bending and twisting devices, but claim 2 of the patent in suit, which recites the rudders and the distortable wing, has no counterpart in the original application, and claims 5 to 9, both inclusive, characterized as they are by the indefinite terms as "means" for producing "lateral stability," and "means" for producing "longitudinal stability," with a single vertical lever for operating these means, but slightly, if at all, resemble either in form or substance the original claims.

The patent specification either as issued or as originally filed shows nothing upon which to predicate novelty or utility in the

vertical position of the stick, or the so-called reflex or instinct theory, and, as was clearly shown by the competent and experienced flyers called as witnesses by the defendant, there is no substance to the natural or animal instinct theory, either in learning to fly or in flying an aeroplane; on the contrary, the untrained natural or instinctive reactions cannot be depended upon and often are erroneous and confusing, and need to be inhibited or trained.

Even if it be thought that there is any substance to the so-called reflex or instinct theory, then to me it seems certain that the horizontal stick, which is moved up to go up, and down to go down, is a more natural control than the single vertical stick, and the plaintiff in his 1918 book appears to be in agreement with me when he asserts that the "single lever acting in the direction of the pilot's 'reflexes'" is described in his 1906 French patent (patent No. 372,753), the one with reference to which he failed to file an application in the United States.

In view of the prior art, there was no novelty in twisting the lever of French patent No. 372,753 from a horizontal to a vertical position, in substituting a lateral pivoting movement of the upstanding lever for a rotary movement, as in Laroze, in changing the depending lever of Goupil to an upstanding lever, or in grasping the levers of Ferber above the pivot instead of below the pivot, as was done by Ferber.

There certainly was no novelty in the use of a well-known control device, the lever, to effect the control of two of the three controls, nor in the selection of the two of the three controls to be so effected, as it was a mere matter of engineering choice as to which of the three organs should be operated by a single lever.

Therefore, but for the so-called bird tail or ring tail unit for control about the longitudinal and vertical axes, I can find no invention. Atlantic Works v. Brady, 107 U. S. 192, 205, 2 S. Ct. 225, 27 L. Ed. 438; Bradley v. Eccles (C. C. A.) 143 F. 521; Briggs v. Central Ice Co. (C. C. A.) 60 F. 87; Lovell-McConnell Mfg. Co. v. Oriental Rubber & Supply Co. (C. C. A.) 231 F. 719.

The patent in suit has had no commercial success and has made no impression on the art. No machine embodying the alleged invention of the patent in suit has been manufactured in this country, and in neither of the machines embodying such invention, manufactured abroad, was the plaintiff able

to accomplish sustained flying for any considerable distance.

The great forward steps made by the aeroplane have been due most largely to improved engines, the weight of which per horse power has been so largely reduced as to make possible, with the same weight, speed greatly in excess of the aeroplanes of the prior art. '

This statement seems to be in accord with the plaintiff's experience, because, in a lecture delivered by him in 1912, he said, "The motor of the aeroplane has been the part which by its absence has delayed the art of aviation for so long, and from the day when it became an actuality it has caused and enabled the rapid progress we have seen."

Giving to the patent in suit the benefit of the presumption of validity, it must be strictly limited to the structure disclosed, embodying the so-called bird tail or ring tail unit for control, about the longitudinal and vertical axes, with a greatly restricted range of equivalents.

Defendant contends that there was deliberate and calculated delay in the Patent Office in the allowance of the patent in suit, and that such delay was chargeable solely to the plaintiff.

That there was serious delay on the part of the plaintiff cannot be denied, because we find that the Patent Office was unusually prompt in its actions, and the extent of delay between the dates of the seven office actions of the Patent Office, and dates of the seven amendments by plaintiff, to be in the order as follows: First, ten months and twenty days; second, one year less one day; third, one year less one day; fourth, one year less four days; fifth, one year less two days; sixth, one year less three days; and, seventh, three months less fourteen days.

Under the statute the plaintiff had one year in which to act after office action in the Patent Office, and therefore the delay did not render the patent invalid; but, when it is considered that claims 5 to 9, both inclusive, in which for the first time there is any mention of reflex movements, were not introduced by amendment until 1914, five years after the joy-stick had been publicly used in, and four years after planes with the joy-stick had first been manufactured in, the United States of America, and that from such times until the date of the granting of the patent in suit planes with the joy-stick had continued to be manufactured and commonly used in this country, the claims should be examined with the greatest care

on the question of infringement. This is especially true in view of the fact that in none of the claims in suit is there specified an upstanding lever, the claims simply call for a vertical lever, and a depending vertical lever had been described by Ferber in the publications in evidence long prior to any dates available to plaintiff, and likewise an upstanding vertical lever had been described and shown in the French patent to Laroze.

France was not at war at the time of the long delays, as they antedated June 13, 1914, and war was not declared until August, 1914.

It does seem to me in the light of all the circumstances, that the claim of a "single lever being operable by reflex movements of the body of the aviator to restore said aeroplane to an even keel when it departs therefrom in either a lateral or longitudinal direction" is clearly an afterthought and not shown in the original specification covered by the original claims. It certainly is not sufficient, in my opinion, to give novelty to the substitution of the lever of the patent in suit over the levers of the prior art.

Defendant contends that by the contract of November 1, 1911, between the plaintiff and one Louis Bleriot, in which among others the following recitals are found:

"In consequence of claims made by Mr. Esnault-Pelterie, against Mr. Bleriot, relative to his single bell lever, Mr. Bleriot has been able to prove to Mr. Esnault-Pelterie that he was in prior, legitimate and personal possession of the invention—that is to say, of the single lever mounted on a cardan joint—by proofs accepted by Mr. Esnault-Pelterie. * * *

"By reason of the legitimate and prior possession strictly limited to the person of Mr. Bleriot, the latter may provide his machines with his arrangement of single bell lever without paying any royalty to Mr. Esnault-Pelterie"

—the plaintiff conceded prior invention to Bleriot.

In order to properly estimate the concession contained in the said contract, it is necessary to consider the law of France under which the first to file, whether he be the true inventor or has acquired the secret from a third party, is entitled to a patent. The patent is granted to the one who represents himself to be the inventor, without requiring him to render an account of the origin of the invention, and the patent cannot be annulled on the ground that the patentee is not the true inventor. What the French law requires is that the invention shall not have

been publicly practiced or known before obtaining a patent.

The expression in said contract, "en possession anterieure legitime et personelle" (in prior legitimate; personal possession), is one peculiar to the French law. The effect is that one who can prove that he possessed an invention prior to the taking out of the patent, which possession is secret in character and does not have any public character, cannot invalidate the novelty of the patented invention, but such possessor has the purely personal right to continue to exploit freely the invention, but he cannot sell or transfer such right to any third party. It is unquestioned that the plaintiff was the first to file.

Plaintiff's explanation of the reason for the insertion of the recital in question in the said contract is convincing, and its legal effect was not to concede prior invention to Bleriot, but to assert the validity of the patent against all others, and simply to recognize the right of Bleriot personally to whatever invention he personally possessed prior to the filing by the plaintiff and to exploit the same without the payment of any royalties.

■ The second contract was properly admissible to show that the first contract was superseded by another. Perrin v. United States (C. C. A.) 169 F. 17, 27.

The structure shown in the Vautrin letter and sketch was one wherein a horizontal lever was connected to operate a crossed vertical steering rudder and a horizontal elevator rudder. The handles were moved up and down for elevating, and to right or left for steering; the steering operation being exactly like that of the tiller of a boat.

This simply corroborates what I have found, that there was no novelty in substituting a vertical for a horizontal lever. The lever in question was an old device. This is apparent from an examination of the Harkness United States patent No. 168,486, cited by the Examiner. This device was used by Bleriot in the spring of 1907, but plaintiff had no knowledge of its existence or use.

The witness Peyret, on whose testimony defendant relies, testified that the Canard machine was the first to have a cardan control, and was constructed between November, 1906, and March, 1907, when it was tested. In Ferber's book of 1908 there is an illustration of this machine, but the date given of March 21, 1906, is obviously an error and should be March 21, 1907.

There is no evidence to show that plaintiff had any knowledge of the existence or use of this machine, but in any event the date of testing was subsequent to the date of the filing of the application of the latest of the three French patents of the plaintiff, which we have been considering.

Plaintiff did not by the contract in question admit priority of invention by Bleriot.

■ In view of my holding that there was no invention in the substitution by plaintiff of the vertical lever over the prior art, there is no necessity for any extended consideration of Bleriot's patents, which are subsequent in date to all of the plaintiff's three patents which we have been considering, but his disclosure of a vertical lever in his patent of addition of October 15, 1907, antedates the first disclosure of a vertical lever by amendment in the progress of the patent in suit in the United States Patent Office. In any event there was no infringement by the defendant.

The defendant's machine is and will be hereinafter designated as the Corsair, and follows the prior art. It has the biplane structure of the Wright patent. The patent in suit is directed to a monoplane.

The Corsair has entirely separate and distinct horizontal and vertical rudders, as does the Wright patent, with independent means for operating them. The patent in suit has a single rudder for elevating and turning of the bird tail modification or an integral structure mounted pendulumlike on a ball and socket joint of the ring tail modification, with two levers connected thereto for steering.

The Corsair has rigid wings and separate ailerons, as do Goupil, Laroze, and Ferber. The patent in suit has wings distortable or warpable, for lateral control like Wright.

The Corsair has automatic stability for equilibrium, like Goupil and Ferber, laterally, directionally, and longitudinally, in the form of wing dihedral, longitudinal balancing stabilizer, vertical surfaces, and sweepback, and is of the stable type. The patent in suit is of the nonstable type, and depends for equilibrium solely upon the manipulation of the control levers.

The Corsair has the movable and adjustable balancing stabilizer of Goupil, with elevator surfaces attached thereto. The patent in suit has merely the movable horizontal surface under the control of the pitch and yaw lever.

The Corsair has ailerons and elevator surfaces for maneuvering and evolution purposes, operated by a single instrumentality

in the form of a universally mounted vertical lever, as do Goupil, Laroze, and Ferber.

The patent in suit has two symmetrically arranged levers, connected to a single, integral tail unit, which is not in the defendant's machine.

The Corsair uses the same universally mounted lever for performing multiple operations in its control, as are shown in the Weeber patent.

The control responses from the lateral and longitudinal control devices of the Corsair are the same as are shown in the Wright patent.

The structure of the Corsair is the same as that shown in the Goupil publications, except that it has upstanding levers in place of the depending levers of Goupil.

The Corsair has a vertical upstanding lever like Laroze, with the same longitudinal response, but with lateral movement substituted for the rotary movement for lateral evolution control.

The same responses are found in the Corsair as in the French patent No. 372,-753, except that in the Corsair the fore and aft movement, for ascending and descending, is substituted for the up and down movements of the said French patent.

There is not found in the Corsair the monoplane structure, the distortable wings, the integral bird tail, nor the two symmetrical lever arrangement for flapping the wings and twisting and bending the tail of the patent in suit, which, as I have hereinbefore said, are its only novel features.

The Corsair differs fundamentally, both in structure and mode of operation, from the patent in suit. The equilibrium of the machine of the patent in suit depends solely on the manipulation of the controls, which had to be operated at a rate in excess of one movement a second. In the Corsair there are built-in means for automatic stability, and these means produce stability of equilibrium both laterally and longitudinally.

The Department of Commerce regulations with respect to the automatic stability requirements for commercial machines are complied with in the Corsair.

The Corsair, for producing lateral stability or keeping it on an even keel, has a dihedral of one and one-half degrees in its wings K and L, the vertical surfaces T and V above the line of thrust, and the sweepback of the upper wing. These things are not found in the patent in suit, and the pilot must continually manipulate the wing warping control in order to maintain an even keel.

The longitudinal balancing of the machine of the patent in suit is solely dependent upon the constant and continuous manipulation of the control handles. The longitudinal balancing of the Corsair is effected by the stabilizer M, which has a special setting with respect to the wings, and has no connection whatever with the sticks B B'. It has its own adjusting mechanism in the side wheel N disposed in the cockpit, which through the chain and cables R turns sprocket P, which in turn lifts or lowers the post O, carrying with it the rear part of the stabilizer M and the front edge of the elevator S.

Not only does the stabilizer M have the balancing function in fixed position, but through its adjustability, it has the important function of enabling the pilot to compensate for a special distribution of load longitudinally, and to trim his ship while in the air, to obtain any desired maneuver, such as for making the machine tail-light when taking off, and tail-heavy when landing, or to make any other adjustments at the will of the pilot when in the air.

In the machine of the patent in suit these functions are attainable only through the manipulation and grasp of the levers by the pilot.

The Corsair has automatic directional stability, in the vertical fin surfaces T and V and in the sweepback.

The machine of the patent in suit has no automatic directional stability, but is dependent upon control manipulation for that purpose.

In the Corsair the means for producing stability laterally, longitudinally, and directionally are automatic, and the evidence shows that it flies itself and the pilot can release the controls at will.

In the machine of the patent in suit there is nothing automatic except some slight effect from the fusilage covering, which is so small as to be practically nil, due to the disposition fore and aft of the covering and its conical shape, and the pilot must constantly manipulate the controls to produce stability and thereby maintain a level and directional position.

In the patent the purpose of the lever is to produce stability.

In the Corsair there is automatic stability to such a marked degree that the primary purpose of the control sticks B B', and the

stirrups or pedals X Y and X Y', is to produce instability and enable the pilot to make any maneuver, notwithstanding the capacity of the machine to automatically stabilize itself. The ability to neutralize the inherent stabilizing characteristics, at the will of the pilot, results in an increasing capacity to accentuate or hasten the action of automatic stabilizing characteristics, at the will of the pilot.

In the machine of the patent in suit the entire tail is a rigid unit, steerable in the manner of a bird's tail.

In the Corsair there is a fixed vertical fin, fixed to a relatively adjustable horizontal stabilizer, with movable surfaces pivotally attached to and trailing those stationary vertical and horizontal surfaces.

There is a fundamental difference in the Corsair's control from that of the two-lever control of the patent in suit.

Wing distortion or twisting, of the patent in suit, is not used by the defendant.

The Corsair has rigid dihedral wings for lateral stability, automatically produced, and has ailerons, and two pair of interconnected foot pedals or stirrups X Y and X Y', both stirrups of a pair being essential for steering in both directions.

In the patent in suit a single vertical lever 68 (80) for steering is asserted as an essential element of the patent.

For longitudinal balancing and longitudinal steering, the Corsair has two separate controls, namely, the side wheel N in the cockpit, for adjusting the stabilizer for balancing, and the two upright sticks B B', mounted upon a rock shaft G, for operating the elevator surfaces S, for steering up and down.

The patent in suit shows and claims a vertical lever for performing both of such functions.

In the Corsair, lateral stability is automatically produced by the control sticks B B', and longitudinal balance is automatically produced by the built-in or fixed means, assisted by the side wheel N.

In the patent in suit a single lever is shown and asserted for both of these functions.

The Corsair uses for control of the plane the control handles B B' and two pair of foot pedals or stirrups X Y and X Y', which have no symmetrical relation with the handles B B' and a side wheel N.

In the patent in suit there are two symmetrically arranged sticks 61, 68 (80, 86), for control of the plane.

The Corsair does not simulate bird flight as proposed in the patent in suit, nor does it employ the ring tail, the bird tail, or tandem wing arrangement of the patent in suit.

The two levers of the patent in suit are connected with the integral tail unit thereof, and, due to the interaction and confusion between pitch and yaw controls, inherent in the machine, pitch or yaw control cannot be effected solely by one stick, nor can either stick be released during control.

In the Corsair the steering control and the elevator control are independent both mechanically and functionally.

The automatically stable Corsair, which has been flown for hours with hands off, is, with respect to control, the antithesis of the distinctly unstable machine of the patent in suit, the levers of which must be constantly manipulated to preserve equilibrium.

Essential identity of means to establish infringement is entirely lacking.

Even if the Corsair may be brought within the letter of the claims of the patent in suit, the defendant has so changed the principle of the device that the claims of the patent in suit, literally construed, have ceased to represent its invention, and defendant cannot be adjudged an infringer. Westinghouse v. Boyden Power-Brake Co., 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136.

Plaintiff contends that claim 2 of the patent in suit covers the alleged vertical lever invention. This contention does not seem to me to be sustained, but, if that contention be sustained, it is limited to the structure disclosed, embodying the so-called bird tail or ring tail unit for control about the longitudinal and vertical axes, and was included in the amendment of 1909.

Plaintiff also contends that claim 12 of the amendment of February 1, 1909, was directed to the vertical lever control. Assuming that contention to be sustained, the plaintiff is estopped to assert that claim, on the record of the Patent Office, which on March 2, 1909, rejected claims 12 and 13 on the French patent to Laroze, No. 356,842, and on May 10, 1910, again rejected, on Davidson British patent, No. 13,700, and on Laroze French patent, No. 356,842, and finally on May 27, 1911, on Davidson British patent, No. 13,700, alone, which rejection was acquiesced in and the claims canceled by the plaintiff on May 23, 1912.

Claims 12 and 13, which were canceled,

differed from the vertical lever claims of the patent in suit, in that claims 12 and 13 specified a lever for "governing the longitudinal inclination" instead of the lever operating the means for "producing longitudinal stability," as in the patent in suit.

In the Corsair the vertical sticks "govern the longitudinal inclination" of the machine, as specified in said claims 12 and 13, and do not produce longitudinal stability, as claimed by the patent.

Therefore, by the acquiescence by plaintiff in the rejection and canceling of said claims, plaintiff is estopped to assert that the patent in suit covers what the Patent Office rejected.

The contention of plaintiff that the patent as allowed covered broader claims is not sustained, because, as I have shown, claims 5 to 9, both inclusive, do not cover what the Patent Office rejected, which is found in the Corsair, the vertical sticks to "govern the longitudinal inclination," but do prescribe vertical sticks to produce longitudinal stability, which is not their function in the Corsair.

The claims in suit are not applicable to the Corsair.

Claim 2 specifies "distortable wings for maintaining transverse stability," which are not found in the Corsair, for the reason that transverse stability is inherent and not maintained by such distortion or by other hand control means, and the ailerons in their normal operation perform only the banking and maneuvering functions.

The "rudder for maintaining longitudinal stability" in the Corsair is the adjustable stabilizer, which is adjusted through the side wheel and not by the vertical lever, and the elevator serves to destabilize the machine for ascending or descending.

The Corsair has separate means for controlling the steering rudder, comprising two pair of swinging stirrups or pedals, sometimes suspended and sometimes upright, but not a lever, and both pedals of a pair are necessary to steer the machine.

If claim 2 could be applied to the Corsair, it is inapplicable to the structure of the patent in suit. In the patent there is no steering rudder, separate from the rudder for maintaining longitudinal stability, in either the bird tail or ring tail modifications, in which alone there is any invention, and the left-hand lever is in no practical sense separate from the right-hand lever. Both are connected to the integral tail unit, to which alone is connected the right-hand lever 61.

The levers are so interdependent in operation that whenever one is moved to achieve certain results the other must be compensatingly moved to achieve any sort of flight.

If claim 2 be given the broad construction contended for by the plaintiff, it would be anticipated by Laroze and Goupil, and void as covering the invention of French patent No. 372,753, which was dedicated to the public in this country by failure to file an application in time in the United States Patent Office.

Claim 6—like claim 2, it also specifies the separate means for operating the steering means, and, by implication, the separate means for steering, but, for the reasons indicated in connection with claim 2, it does not apply to the Corsair.

If this claim, as well as claims 5, 7, 8, and 9, could be applied to the Corsair, it would not be applicable to the structure of the patent in suit, for the reason that there is not a single vertical lever for operating both the stability producing means, in that both of the levers of Figs. 6 and 10 produce yaw, and both of them produce pitch, and necessitate a compensating movement for one each time the other is operated.

Claims 5 to 9, both inclusive—these claims do not even in terms apply to the Corsair, as its means for producing stability are not operable by the vertical stick, but they either form a fixed part of the machine, or are adjustable by the side wheel N, a means separate from the stick.

The Corsair is a stable machine, and the controls of that machine do not produce stability, but do produce instability for bringing the plane into a maneuvering altitude.

The phrase "producing stability," as used in the patent in suit, means maintaining the equilibrium of the machine, or keeping it level; in other words, keeping it on an even keel or level altitude. This clearly appears in the patent specification, wherein the patentee ascribes to the movable, horizontal surfaces 71 and 60 two functions, namely, the maintenance of longitudinal stability, and for the ascent and descent of the machine, and the horizontal surfaces 60 are referred to as the "ascensional" rudder "for convenience." The only function assigned to the warping of the wings 5 is that of producing transverse stability.

It is the meaning which the patentee gave to the words which is apparent from the patent itself, and not the meaning according to the dictionary or any writers at the time

which governs. International Cork Co. v. New Process Cork Co. (C. C. A.) 6 F.(2d) 420; Advance Rumley Co. v. John Lauson Mfg. Co. (C. C. A.) 275 F. 249; Rajah Auto Supply Co. v. Belvidere Screw & Mach. Co. (C. C. A.) 275 F. 761; Cadwell v. Firestone Tire & Rubber Co. (D. C.) 13 F.(2d) 483; Health Products Corporation v. Ex-Lax Mfg. Co. (D. C.) 24 F.(2d) 245.

The patent in suit is directed to the production of stability by hand instead of automatically, and that produced by the pilot with the joy-stick is the only stability produced by the patent.

In the Corsair stability is automatically produced, and is never anything but automatic, although the pilot may operate the universally mounted handles to accentuate it.

The defendant does not infringe.

The defendant also interposed the defense of laches. The patent was issued on November 14, 1914, at which time France was at war. Plaintiff did proceed in the French courts under his French patents. The defendant herein was not engaged in manufacturing aeroplanes for private parties until 1928.

Aeroplanes which plaintiff contended infringed the patent in suit were manufactured by the defendant for the United States government prior to that time, and as to them plaintiff's only remedy was against the United States government, under the Act of July 1, 1918, 40 Stat. 705, now title 35, U. S. Code, § 68 (35 USCA § 68).

Plaintiff, after unsuccessful negotiations with the United States government from 1922, commenced an action against the government in the Court of Claims in 1924, which action is still pending. Of that action the defendant must have had notice.

Under the circumstances, it does not seem to me that the plaintiff unreasonably delayed in commencing his action against the government.

No action could be brought against the defendant in this or any other court until it manufactured and sold to private parties. This it did for the first time on July 31, 1928, and plaintiff gave defendant notice on January 6, 1930, and commenced its action in this court on March 13, 1930.

While I disagree with the plaintiff's contention that the delay in bringing this action to trial was wholly the fault of the defendant, and find that both parties were to blame for delay, I am firmly convinced that the defense of laches has not been sustained.

Defendant offered in evidence Exhibit AAA, a translation of certain German Patent Office proceedings. It was not properly authenticated, and the mere fact that it came from the possession of plaintiff or his attorney, in response to an interrogatory requiring production of papers in his possession, does not make it evidence.

This paper was not original evidence, even if authenticated, that was material to the issues involved herein, except to show an admission against interest, but, if it was intended to use it for this purpose, plaintiff, while on the stand, should have been interrogated as to it, and, as he was not, it is incompetent, immaterial, and irrelevant. General Electric Co. v. P. R. Mallory & Co. (C. C. A.) 298 F. 579. The motion by plaintiff to strike out is granted, with an exception to the defendant.

A decree may be entered in favor of the defendant against the plaintiff, dismissing the bill of complaint with costs. Let defendant submit findings of fact and conclusions of law in accordance with this opinion, for the assistance of the court.